Scott Bruce DAVIS, Petitioner-Appellee,

v.

John JABE, Respondent-Appellant.

No. 86–1620.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 20, 1987.

Decided July 23, 1987.

Thomas A. Kulick (argued), Asst. Atty. Gen., Lansing, Mich., for respondent-appellant.

P.E. Bennett (argued), State Appellate Defenders Office, Lansing, Mich., for petitioner-appellee.

Before MERRITT, WELLFORD and MILBURN, Circuit Judges.

WELLFORD, Circuit Judge.

Scott Bruce Davis (Davis), convicted in Michigan state courts of first degree murder for the premeditated killing of John Mac Ryan, Sr., in 1980, filed a habeas corpus petition seeking relief from a life imprisonment sentence. We are concerned only with the conviction for premeditated murder, because a felony murder conviction with regard to the robbery of Ryan has been vacated on double jeopardy grounds. The district court granted Davis relief, 630 F.Supp. 1102, and the state appeals. Ryan, Sr. was killed by a shot in the back of the head at close range. We recite pertinent facts set out by the district court:

Petitioner [Davis] was a friend of Ryan, Jr. and had at one time lived at the Ryan home. At the time of the murder, however, he was staying at the home of his cousin, Ronald McClusky. The day following the murder, Petitioner told Detective Robert Bates that he had been at the Ryan home between 10:00 and 10:15 p.m. He stated that he had talked to the victim, telephoned his sister, and after approximately fifteen minutes, left to go to his sister's house. In a statement made to the police the following day, Petitioner admitted having searched through the house for some items he had left there. He also admitted that he may have touched the murder weapon.

Petitioner was arrested for the murder about a week later. Because he was only sixteen years old at the time, he was placed in the Oakland County Children's Village. On February 27, 1981, he was convicted by a jury of first degree murder and was subsequently sentenced to life imprisonment.

At trial, the following evidence was presented: Terry Lee McClusky, another of Petitioner's cousins, testified that he dropped Petitioner off at the victim's house at about 8:00 p.m. on May 22. A neighbor, Nancy McKee, testified that she drove by the victim's house between 9:40 and 9:45 p.m. that evening, that she saw Ryan, Sr. talking to a male with long, straight hair, and that Ryan, Sr. waved at her when she sounded the horn. Petitioner had long, straight hair on May 22.[1]

Twelve-year-old Lonnie Cunningham, who lived next door to the victim, testified that a little after 10:00 p.m. he saw Petitioner enter the Ryan home through the back door, go into the bedroom, pick something up, and move on. Ryan, Jr. had previously testified that one of the rifles was kept in the bedroom which Cunningham claimed to have seen Petitioner enter. The record indicates, however, that someone may have suggested to Cunningham that Petitioner was the person he saw.

Ronald Arnold, who lived on the street next to the Ryans, testified that he saw Petitioner walking down the street between 10:20 and 11:00 p.m. Although he was unsure of whether Petitioner heard him, Arnold stated that when he called and whistled at him, Petitioner began to run away. The prior testimony of Sharon Ann Eaglan, a friend of Petitioner's family, was read to the jury. She stated that Petitioner had come to her house at about 10:45 p.m. on the night of the murder, called his sister, left after about five minutes, and did not seem excited or in any way abnormal. She further testified that Petitioner telephoned her the following day, told her that he was "involved in some murder or something," and asked her if he had been at her home at 9:45 p.m. the previous night. He asked her to tell the police that he had been at her home, but did not suggest that she lie about the time.

An employee at the Oakland County Children's Village stated that on June 29, 1980, Petitioner and some of the other boys were boasting about the reasons for their confinement. The employee testified that when one of the boys said that

---

1. Davis' distinctive long hair, parted in the middle, which hung below shoulder level, had been cut at time of trial.

he had heard that Petitioner was in for murder, Petitioner replied, "Yeah, I blew the sucker's brains out, and he only had thirty dollars in his pocket."

Ronald McClusky testified that three or four days before the murder, Petitioner had asked to borrow McClusky's brass knuckles in order to hit and rob Ryan, Sr. According to McClusky, Petitioner asked to borrow his shotgun a few days later, stating that he intended to blow Ryan Sr.'s head off and that on May 21, the day before the murder, Petitioner again asked to borrow a rifle.

Initially Davis denied entering the Ryan house, then later he stated that he had a conversation with the deceased inside the front door and that he went inside to use the telephone. He claimed that he left the house, walked to his sister's home, and then walked home to meet a friend.[2] Davis also told the police in a subsequent voluntary interview that he had asked John Ryan, Sr. "if he could check the house to see if he could locate his—a pair of socks and a car flare that he had left there."[3] He said that he went into a back bedroom and "noticed a .22 rifle propped against a wall near a dresser, and he said that he couldn't remember at that time but he may have picked the rifle up and moved it, you know, to look for his items."

From the facts recited, it is evident that there was abundant proof adduced at trial, pointing to Davis as the killer. Davis' theory of defense elicited from others was to point to motives of others, including particularly Ron McClusky, who might be disposed to kill Ryan, Sr. McClusky, unemployed, lived nearby and had not warned his friend, John Ryan, Jr., about Davis' alleged threats to kill his father. McClusky also admitted to using and selling marijuana and that he and the victim did not get along.

The principal issue involved in this appeal was the refusal of the trial judge to permit certain proferred testimony of Davis' brother, who would have given the following testimony, if permitted:

I along with my brother Scott Davis and Ron McClusky were playing cards at Ron's home in the dining room on a Friday or Saturday evening during the latter part of April, 1980;

While the three of us were playing cards, Ron's wife, Patricia and their infant son were occupied in another room in the house;

During the course of the evening, I recall Ron saying: "Hey, man, I know how you guys can make some money. You can take these here (pointing to the homemade brass knuckles) and go to Big John's [Ryan, Sr.] and hit him because he should have about three grand in his pocket."

I said: "No way. I'm not getting into that type of shit."

Scott said: "No way, Bullshit."

The state trial court ruled out this testimony as being inadmissible, but the Michigan Court of Appeals held this ruling to be error, albeit harmless error, because it should have been admitted to impeach McClusky's credibility. The Michigan appellate court held, however, that the excluded testimony was not "critical," did not exculpate Davis and did not tend to show that McClusky, rather than Davis, had committed the murder.

Citing *Chambers v. Mississippi,* 410 U.S. 284, 294, 302, 93 S.Ct. 1038, 1045, 1049, 35 L.Ed.2d 297 (1973), the district court granted the writ holding that the Michigan court's conclusion that the excluded testimony went only to credibility, that it was not exculpatory, and that it was not "critical" to Davis' defense, was error. Exclusion of this testimony offered by Davis at his murder trial, was deemed by the district court to be both "material and favorable" to his defense, because it "may have led the jury to reasonably doubt Petitioner's [Davis'] guilt." This state court action, characterized as erroneous, was held to have violated the "Due Process Clause" and the "Compulsory Process Clause" of the Fourteenth and Sixth amendments. A

---

**2.** The identified friend was not called as a witness at trial.

**3.** Davis, and others, before the night of the murder had been working on Ryan Sr.'s house.

conditional writ of habeas corpus was therefore granted Davis, and the state has appealed.[4] We reverse.

An examination of *Chambers, supra,* reveals that the factors in that case for admission of challenged testimony were far more compelling than in this case. Indeed, there is little real comparison of *Chambers* with the facts in this case. In a prosecution for murder in which Chambers received a life sentence, he sought to examine as a hostile witness one McDonald who had four times confessed or admitted to the same killing, once under oath. Later, this witness repudiated his confessions and this fact had been emphasized by the prosecution. The Court noted particularly that Chambers "was denied an opportunity to subject McDonald's damning repudiation and alibi to cross-examination." *Id.* at 295, 93 S.Ct. at 1046. He was also denied the opportunity to present three witnesses (on grounds of hearsay) each of whom would testify that the witness in question had admitted that he, rather than Chambers, had fired the fatal shots. The Court held that the excluded testimony "tended also to exculpate Chambers," and that the effect of the trial court's ruling was "seriously adverse to Chambers." *Id.* at 297, 93 S.Ct. at 1047. The Court in Chambers, moreover, held that the denial of the right to examine as a hostile witness, *when combined with* the exclusion of three witnesses who heard McDonald admit that he had fired the fatal shots in question, constituted a due process violation.

The district court conceded that the excluded testimony in this case was "not directly exculpating." The district judge relied on a "possibility" that the proferred testimony may have brought about a reasonable doubt. The trial judge conceded also that the testimony here involved lacked the "overwhelming assurances of reliability as were the statements in *Chambers.*" We find that the testimony of Davis' brother is not truly exculpatory—the witness McClusky, is stated to have mentioned to Davis and his brother that they might use his homemade brass knuck-

les to "hit" Ryan, who reputedly had a substantial amount of money. Allegedly Davis and his brother declined the opportunity to "hit" Davis at that time. Whether this self-serving testimony by Davis' brother that they would not participate in a robbery suggested by McClusky would be admissible is a difficult question.

The district court held that Larry Davis' testimony should have been admitted primarily because it "might have established that *McClusky's motivation to testify* was to shift the suspicion of guilt from himself to Petitioner [Davis]." (emphasis added). This seems somewhat inconsistent with the fact McClusky's wife testified that she and McClusky believed Davis, as first cousin, to be innocent of the murder. The purported statement of McClusky was that the Davis brothers might "make some money" by using his brass knuckles to "hit" Ryan, not that he, McClusky, would be involved in this act. The statement, then, is ambiguous at best as to whether McClusky was to be a participant in attacking Ryan. We fail to see how this statement is vital or crucial to Davis' defense, although it would challenge McClusky's testimony to the effect that it was Davis who asked for the brass knuckles; borrowed them; and spoke of an intent to use them on Ryan.

It was pointed out in *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982) that the Sixth Amendment secures a defendant's right to compulsory process to obtain testimony of *"witnesses in his favor."* Quoting *Washington v. Texas,* 388 U.S. 14, 16, 87 S.Ct. 1920, 1922, 18 L.Ed.2d 1019 (1967), the Court in *Valenzuela* noted that denial of testimony is a Sixth Amendment violation only where it is *"relevant and material and . . . vital* to the defense." (emphasis added in citation, 458 U.S. at 867, 102 S.Ct. at 3446). The *Valenzuela* Court observed that Rule 17(b) of the Federal Rules of Criminal Procedure requires a subpoena for a defendant's witness where *"necessary* to an adequate defense." 458 U.S. at 867 n. 7, 102 S.Ct. at 3446 n. 7 (emphasis added).

---

**4.** We have previously granted a stay pending our decision in this case.

*Valenzuela,* moreover, stands for the proposition that in order for suppression of a defendant's proferred testimony to constitute a constitutional violation the testimony must establish a reasonable doubt about guilt in light of the entire record in the case. 458 U.S. at 868, 102 S.Ct. at 3447 (citing *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976)). The denial of the testimony must constitute such an "absence of ... fairness" that it "fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." 458 U.S. at 872, 102 S.Ct. at 3449 (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. at 280, 290, 86 L.Ed. 166 (1941)).

We find the decision of the Michigan Court of Appeals more on target under the factual circumstances here than that of the district court. It was an evidentiary error not to have permitted Larry Davis, the brother, to testify. While that testimony may have been material, we entertain serious doubts that McClusky's alleged remarks addressed to the Davis brothers were favorable or exculpatory, and we find them not to be vital or critical to the defense in the sense that excluded testimony in *Chambers* and *Washington* was crucial to a fair trial. We are also not convinced that the evidence tended to show that McClusky had committed the murder.[5]

The error in not allowing Larry Davis to testify about McClusky's alleged remark, was not an error of constitutional magnitude. The state trial of Davis was not fundamentally unfair or flawed. In *Rose v. Clark,* — U.S. —, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), the Supreme Court "explained that in the absence of error that renders a trial fundamentally unfair, such as denial of the right to counsel or trial before a financially interested judge, a conviction should be affirmed 'where a reviewing court can find that the record devel-

oped at trial established guilt beyond a reasonable doubt.'" *Pope v. Illinois,* — U.S. —, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439 (1987). *See also Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Neuroth,* 809 F.2d 339 (6th Cir.1987) (en banc). More recently in *Delaware,* the Court stated that:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* at 1438. (citations omitted).

The evidence of Davis' guilt in this case was very substantial. He had threatened to rob and kill the deceased a short time before the murder; he asked his cousin to borrow a gun shortly before the murder; he admitted to a fellow inmate after his arrest that he had committed the murder by blowing Ryan's "brains out," and admitted to police, changing his story in this respect, that he was in the victim's home at about the time of the murder, or shortly before, and that he may have fingered the murder weapon. Not only that, defendant failed to offer several key witnesses whom he claims he called or visited at the time in question on the night of the murder, and he

---

**5.** Davis' counsel made the inference in his appellate brief (at p. 18) that Ronald McClusky's suggestion to the Davis brothers "that they assault and rob Big John [Ryan, Sr.] showed that Ronald was thinking of committing the exact crime that occurred several days later." Counsel, of course, had the opportunity to cross-examine McClusky at length about what he allegedly said, and about any motive he may have had to kill Ryan.

altered his appearance for the trial. There was also a considerable question whether Davis' brother was in jail on one of many different criminal offenses charged against him at the time of the alleged conversation with McClusky and doubt about his credibility in light of his criminal record.[6]

In sum, we are not persuaded that the error in excluding Larry Davis' testimony, essentially of an impeaching character, was of constitutional magnitude. We are satisfied, in light of the whole record, that Davis received a fair trial and had a reasonable opportunity to make out his defense. It is not constitutionally mandated that he receive an error-free trial. *Rose v. Clark*, 106 S.Ct. at 3107. We are satisfied beyond a reasonable doubt of the sufficiency of proof to show guilt, and that the error of exclusion was harmless under all the circumstances.

Accordingly, we REVERSE the district court and DENY the petition for habeas corpus.

MERRITT, Circuit Judge, concurring.

Different reasoning prompts me to reach the same result as the Court. The state's witness, McClusky, denied on cross-examination that the card-game conversation concerning the "hit" on Ryan occurred. To the extent that the testimony of Davis' brother was offered simply to show that McClusky was lying about the conversation, the brother's version of the conversation was not offered for the truth of the matter asserted. The brother's version was offered to show that McClusky was not a credible witness. Ordinarily, a court need not admit impeachment testimony designed to contradict a witness' denial on cross-examination that he made a previous out-of-court statement. *See* 3A J. Wigmore, *Evidence* § 878 at 647 (Chadbourn Rev.1970); C. McCormick, *Evidence* 66–67 (2d ed. 1972). Hence, the state trial court did not violate normal rules of evidence in

disallowing the testimony by Davis' brother as impeachment evidence.

To the extent that the brother offered McClusky's statements to infer that McClusky considered killing and ultimately did kill the victim himself, the statements were offered for the truth of the matter asserted and were therefore hearsay. The petitioner has not suggested that the hearsay falls within a traditional exception to the hearsay rule but rather suggests that the Due Process and Confrontation clauses require its admission. Petitioner argues that the brother's version of McClusky's statement is highly probative of the proposition that McClusky, not Davis, murdered the victim. He argues that the statement must therefore be admitted as a constitutional matter even if it does not fall within an exception to the hearsay rule. I disagree with this argument because the inference sought to be drawn from this statement, *i.e.*, McClusky killed the victim, is extremely weak. This inference is much weaker than the repeated confessions heard by several witnesses in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). A number of other inferences consistent with McClusky's innocence and Davis' guilt are also possible, including the inference that Davis took McClusky's advice and killed the victim. In light of the weakness of the brother's proffered hearsay testimony, the state court was not constitutionally required to admit it.

---

**6.** The district court, indeed, characterized Larry Davis' proposed testimony as inconclusive as to whether or not he was in jail at the critical time.